We'll hear argument first this morning in Case 15-577, Trinity Lutheran Church v. Comer. Mr. Cortman. Thank you, Mr. Chief Justice, and may it please the Court. The State of Missouri has excluded the Learning Center from a recycling program that provides a safer playground for children, solely because the preschool is operated by a church rather than a secular not-for-profit. The State has made several important concessions in this case. Number one, that the policy in this case is not facially neutral. And number two, that based on their religious character, churches are not eligible for the benefit here. This admitted discrimination against religion violates this Court's free exercise principles. First, as stated in McDaniel and Smith, the free exercise clause prevents the government from imposing special disabilities on the basis of religious views or religious status, and forcing a choice between the exercise of religion and receiving either a government benefit, right, or privilege. Assuming that there's no serious risk of an establishment violation, that's off the table. Yes. Are there ever instances in which status, religious status, can be used to deny religions or religious believers benefits from the State? Or are you saying that it's, that absent an establishment clause problem, that status can never be the basis, religious status can never be the basis for a governmental action, or a governmental ordinance, governmental statute? I'm not sure that it can be. I can't think of a specific example. And the reason I say that is, the question is, is why would someone's religious status matter in the first place to receiving a government benefit? And that's exactly the question. On that question, I guess rather long ago now, in the Everson case was back in 1947, this court said in no uncertain terms, what the framers didn't want was tax money imposed to pay for building or maintaining churches or church property. And doesn't that fit this case? And if so, is Everson passé? I don't think it does. Everson also said that we have to be careful in not establishing a church, not to deprive religious people or organizations of general government benefits. And so I think that's the key here. I think there's a difference between funding of religious activities and funding secular activities of a religious organization. But how is the building separate from the religious exercise therein? I believe that this playground is part of the ministry of this church. And in fact, I look at its bylaws, I look at its advertisements and includes play and conducted in a religiously valuable way. I think that's the materials that the church is advertising. How do you separate out its secular function from its religious function? I think the way the court always has. And the answer to that is, for example, even though the motivation behind operating this preschool is a religious motivation, doesn't mean that every single activity that occurs there happens to be religious. Well, how about if the school does a prayer before the children start playing? Or how about if it chooses on a sunny day to do its religious instruction outside? How does the state know or how can it control without then controlling on the basis of belief and viewpoint? How could they control against that involvement? Sure, it's the same way it has in all the case law. And that is, is we have to look at where's the money going to, what's it going to fund? And in this particular instance, for example, if you look at this court's case law going back from Everson and Everson, is the money going to a religious activity or is it going to a secular activity? This court has approved funding to religious schools, just not for religious activities. Kagan. So do you think, Mr. Courtman, suppose there was an application and from a church that used its playground for religious activities, had prayer services there, for example, could the State, in your view, deny the money on that ground? Or at least would you think that that was a significantly different case? I think it would be a different case. I would say the answer to the question would be I don't think they should, and here's why. I think there would be a they should be able to deny it on that ground. And the reason I say that is, is all we're talking about is a surface, a safer surface on the playground for when kids play. As was mentioned in one of the amicus briefs, I believe it was the World Vision brief, the surfacing being softer doesn't enable religious activities, it doesn't allow it, it doesn't prohibit it, it's really completely separate and apart from it. And I think a good example would be something like this. How would you, for example, one of the things that the Court has thought about in the past is like computers for education. So I guess somebody can make the same argument about computers. Well, it doesn't really, it's separate from the religious instruction that might be carried out over those computers. Do you think that that's the same or is it different? I think it's actually easier than computers because you don't have to get into diversion and all the concept this Court has talked about over the years in the Mitchell case and the other types of cases. And here the reason is, is that what we're talking about is just a surface. It's not even the entire playground. It's just a surface that doesn't enable any religious activity. So, for example, if there was a program from a State that said we have a lot of old buildings in town and we're going to reimburse for fire extinguishers for all of the old buildings, including the religious schools, and all the schools. And they said, but if you have a religious school and you use this fire extinguisher reimbursement, could they then be able to say now that you receive that public benefit, that safety benefit, you can no longer include any religion in those classrooms or in the schools. And all my point is I think that would be going too far because it's not advancing or furthering the religious activity. It's separate and apart from it. I'm not sure I understand your answer to the playground being used for a more religious activity. Let's suppose that the public school sometimes uses its playground for things other than children playing, whatever they're going to have, you know, an auction or anything else. Isn't it the consequence of your argument that the church can use the playground for more religious activities if the public school can use the playground for other non-playground activities? I think it can. And I think that the key here is that I'm sorry, you think it can. But I think they should be able to. I think both the public schools should be able to use it for other activities. And I think that the religious school should be able to also. And as I mentioned, I think the reason for that is it would be a penalty on the benefit to say, because we're putting up a safer surface for when the kids play and fall. And that's the main activity here. If for some reason someone prays one day there or they decide to go outside for one event, that doesn't – it's not the government there who's advancing religion. It's an incidental advancement that's done by the private party. Sotomayor, are all of these questions really ones that verge on to the establishment clause of fire extinguishers, Bible lessons on a sunny day and so forth? Because we could go on and on. Suppose you have an earthquake safety program for schools. Or for public – or for buildings with large numbers of people. And you have an earthquake in California, 40 percent of the cost of structure is earthquake-proof. Suppose they have earthquake reinforcement for a church and have to spend extra money because there's a window in the shape of a cross. That's all – these are all establishment problems? They are. And interestingly in this case, the State concedes, and as did the lower court, there is no Federal establishment clause here. Kennedy, but that's what makes the case just a little bit. In my last hypothetical about earthquake safety, any problem there with the – giving the money to a church and spending extra money for the cross and the window? It's all – it's for public safety. I think it would be an issue on the – on the establishment clause, the question of the establishment clause. But once you get to the fact that there is no establishment clause problem, which is what we have here, the question then is can you single out religious people or religious organizations for a penalty from this benefit? Or, as this Court said in McDaniel and Scherber, is that you're forcing them to choose between exercising their religious faith and receiving a public benefit. Sotomayor, I'm sorry. Get it on me. Kennedy, going back to my first question, that means what your position is, if there's no establishment violation, there can never be a distinction based on religion. I wouldn't say never. We – there's no – Give me an example. Well, play in the – what comes to mind is Locke v. Davey and play in the joints. And the reason that's an important one there is because that was a narrow distinction that was based on what this Court said, a unique historical interest. And the Court also said that the program there went a long way to include religion. Here, it closes religion right out at the door. I'm sorry, but it doesn't – We did say in this case, or I think you stipulated, that this school has a nondiscriminatory admissions policy. But suppose it didn't. Suppose its policy was, we prefer Lutheran children, and then if we have any space left over after that, we'll take other Christians. And then after that, maybe Jews, and then everyone else. Everything else is the same. They want the paving of their playground. Could this – could they demand as a matter of federal constitutional right that that playground be funded, even though they have an admissions policy that favors members of their church? I think they can, because they have a free exercise right to religious autonomy to decide who their members are. In fact, most private organizations and religious organizations do so. So this church could say, we will take only Lutheran children. I believe it can. And still get the public money. I believe so, because we're still at the premise of why are we making the church choose between exercising its religion, the same facts in McDaniel v. Patey, and saying he can't both be a minister and also be a constitutional delegate. Mr. Corbyn, do we know what Missouri – how Missouri interprets the term church in its constitution? It speaks about church. Does it have to be – is this a matter of the form of the ownership of a facility? Is this playground considered to be by the State to be part of a church because of its proximity to the church? What if it was a – what if we had a religiously affiliated school that was not adjacent to a church and it had a playground? Would they consider that to be part of – would they consider that to fall within the prohibition? I think it would, depending on how religious it is. And so what Missouri Supreme Court case law has said is, number one, any organization that's owned or controlled by a church. So that answers the church part. So if it's controlled. That's right. And also, any religious organizations that are sectarian or denominational. And so it's not only the church. It's other religious organizations. And Missouri Supreme Court case law says the way we decide those questions is how much religious influence is there in the church? In other words, are they serious about their faith? Do they – is it voluntary for the students there? And so there's a question about how religious you may be in order to receive the benefit or not. But it's clear it applies to religious organizations, and that's what their briefing has conceded, and to churches. Mr. Courtman, my questions about religious uses, I think, was to get at a broader point, a broader distinction, and ask what you think of it. Because it seems that you are on strongest ground when you say, look, the state has decided to fund some activity, and it's denying that funding to a particular party based solely on that party's religious status. And that's the way you briefed the case. I hear you making a different argument, or a broader argument now, that extends into a state's decision to deny some uses – to deny funding to some uses at the same time as it gives funding to other uses, and a state's decision to say, look, we really just don't want to fund religious exercise. They can do religious exercise. We don't want to fund religious exercise. And I understand that you might think that that's out of bounds, too. But what I'm trying to figure out is, is there a distinction between these two things? I don't think it's a broader argument that we're making. What I'm trying to communicate is that when you look at what you're funding – so this program says that you can't use this money for any religious activities, and it has to go toward the playground resurfacing. So it's actually a reimbursement grant where the church already lays out the finances. Once it proves it has put down the surfacing, then it puts this information in and gets reimbursed for it. So the money has to be used for that. My only point is, is can the State then say, for example, in Everson and Allen, now that we've given you this bus transportation or these books, you can't engage in any religious activity once we've given you that separate benefit? Not that you can't use the money for religious activity, which you cannot, and we don't – we don't disagree with that. The question is – Kagan. You don't disagree with that. That's right. The State is entitled to say you can't use this money for religious activity. Yes. And maybe I'll bring you a little bit further. We're entitled to take certain prophylactic measures to make sure that you don't use the money for religious activity. Yes. But I absolutely agree. But once you take that benefit, I think it goes too far to say, like in Allen, for example, we're providing you these textbooks, so you have to stop all religion in your school. And that's all my point of what I was trying to answer. Well, how about the record show about non-daycare or playground activities on this surface? There's nothing in the record that occurs except for children playing on the playground. Excuse me, but you were talking about Locke and how this is dissimilar from Locke. Yes. Well, there is a tradition. There are 39 States with constitutional amendments like the one Missouri has. That's a history that's even longer than the Locke history. And the essence of that history is basically we don't want to, as a country, or the state, spend money on houses of worship. One would think that if there's play in the joints, that that would include the concept that States are free to say we don't want to spend money from the public fist on houses of worship. Now, you say this affects free exercise. We seem to be confusing money with religious practice. I don't think the two are tied. This Church is not going to close its religious practices or its doors because its playground doesn't have these tires. So I'm not sure how this is a free exercise question, because there is no effect on the religious beliefs. No one's asking the Church to change its beliefs. In fact, no one's asking the Church as a condition of saying don't use what we give you for religious purposes. They're not even doing that. They're just saying we don't want to be involved with the Church. Sure. But there's government coercion when you say there's a public benefit, and the only way you could receive that public benefit is if you do not exercise your religious beliefs. But why is that coercion with respect to your beliefs? Because it's a choice just like McDaniel v. Patey. He could not do both things simultaneously. He could not — Mr. McDaniel could not both be a minister and be a constitutional delegate. And what the Court said, forcing that choice — But you can have a playground here. But you can't be a religious organization and have a playground. You have a playground. No one's taking the playground away from you. No, but you're being penalized by not receiving the public benefit. No, the priest was being penalized. The priest was being told you can't be a priest or a congressman. So you can't do one or the other. Right. Here, there is nothing being taken away from you. Sure. It's the same public benefit. You can't be both, run this, operate this daycare as a religious organization and receive the public benefit. What do we do with discrimination for religion under your theory? Because the way you're going in your theory is an expansion of McDaniel's. But putting aside that it's an expansion of McDaniel's, what are we going to end up with when secular people say religious people are being discriminated in favor of and against us? If status should not be at effect on free exercise, what are we going to do with tax benefits? What are we going to do with all the exemptions that churches receive? Those are benefits. Sure. And I would say that the clauses take care of that. So, for example, if it goes too far and the government benefit is solely favoring religion, it's likely a violation of the Establishment Clause. But we also have a ---- Well, there's plenty of people who would think tax exemption goes too far. But I don't. I'm just saying there are people who make that claim. Sure. And the Court's already ruled on that. And so on one side you have the Establishment Clause. If you're going too far to favor religion, there's an Establishment Clause problem. But if you go the other side on the free exercise clause, this Court has said for decades, sometimes we may and even must accommodate religion. And that, I think, is the favorable treatment that Your Honor is talking about. But I think all the clauses work together in that route. If you take it too far, you do have an Establishment Clause problem. In this case, it's conceded there is no Establishment Clause problem. And there is a point where you can accommodate religion, this other benefit, under the free exercise clause. But I think they all balance out each other. And in this particular case, it's not only McDaniel v. Patey, but Lukumi specifically said that if you target religion on its face, which this policy does, then it's unconstitutional. Alito, I'm going to ask you a question. Alito, I don't know whether we need to get into the history of this particular amendment here. I tend to think we don't need to. But at the beginning of the line of questioning that Justice Sotomayor just finished, she began with the suggestion that perhaps this amendment reflects an admirable historical tradition that should be respected. Do you think that that is the proper way to analyze this question? I don't. And this particular provision that we're discussing, they are, and this has been briefed by several amicus briefs and briefly by us, is a product of what we would consider to be one of the Blaine amendments that was not found in Locke v. Davey. And the reason for that is, is it has that same language in the Blaine amendments. It was adopted the same exact year, and there is much history showing about the anti-Catholic bigotry that's behind this specific provision. And several members of this Court have opined on that before. So I think it doesn't carry the same history as this general establishment clause not found in the exertion. Sotomayor, There is a serious debate about that, isn't there? There is. And that's why our argument is, is we believe it is one, but it doesn't matter to the deciding of this case. Breyer. Has the State courts, have they ever said the amendment prevents the State from giving grants or from spending money on police protection for churches? They have not. Have they ever said that it prevents the State from, say, having a border guard, you know, crossing guards or fire protection or, let's say, health inspections? They have not. Okay. In that case, why, just like you and the other side, to spend a minute on this, just a minute, why isn't the case moved? That is, we have a governor. He said he's going to give you the grants. He said that we know for four years this isn't going to recur anyway. There's certainly, of course, it could happen. Somebody brings the case in the Supreme Court and they decide it differently in the State. But what case would you cite as closest to the proposition, this is not moved? You didn't ask for money, did you? No. You just want an injunction for the future. Because of the Eleventh Amendment. And you're going to get that injunction whether you want it or not with the present governor. Possibly and likely temporarily. Unless he, well, temporarily, is there any chance he would change his mind? Yes. What? Well, if the political winds change, we have this policy by Facebook or press release, so it can easily be changed back if political pressure is put on. All right. I see that. What case would you cite? I think the best two cases are Friends of the Earth and the Knox case. In fact, I think those cases are more difficult cases than this case because of the voluntary cessation proposition. But I think that's what I'm saying. There's two questions, isn't there? One is, we're talking about is the case moved, and I think technically it's not moved. But if we think, suppose Missouri has a policy that it has today, very recently, and we were asked to grant cert in this case. That would be a factor in our decision whether we thought this was an appropriate case to review, wouldn't it? This case would have to be here, I guess, in a different posture, maybe coming from the other side, if that was already the policy. I think one of the problems is, is that the original policy was based on the Missouri Supreme Court's interpretation. So what's interesting here is there's already talk that the new policy is immediately going to be challenged and likely struck down by the Missouri Supreme Court. So absent a ruling here, the old policy will be back in place. And that's why it's important for the Court to rule, because it's not — this isn't a permanent change by any means. It's a temporary change. In fact, the government is actually defending both the old policy and the new policy, which I think shows why this Court needs to issue a ruling. But I think what's likely to happen under the Voluntary Cessation Doctrine, especially as this Court has said, we look at this with a critical eye because of the eleventh-hour change, is the State free to return to its old ways? Clearly is, not only in this administration, but in the new lawsuit being brought to challenge the new policy, because it violates why we're here in the first place, is the Missouri State constitutional provision. Kagan. Kagan. Kagan. Can I take you back to the substance, Mr. Cortman, unless anybody — let's talk a little bit about Federalism, and here's what I would like to know. You know, usually when we see these funding cases, it comes in a different context. It comes where the State wants to give money, and somebody is objecting. And this case comes in the converse way, where a State says, we just don't want to fund this institution. And, you know, these Church-State divide, it's a fraught issue, it's a hard issue. It's an issue in which States have their own very longstanding law. It's an issue on which I guess I'm going to say nobody is completely sure that they have it right. And so I guess there's something attractive about having some clay in the joints where States can go their own way and make their own choices. And why shouldn't this be one of those cases? Because I don't think this is one of the difficult cases. In fact, I would say with all the Court's jurisprudence under Free Exercise and Establishment Clause, this is actually one of the easier cases. And the reason for that is if you look at the clay in joints, the first conclusion was there was no free exercise violation there. Here, there clearly is. If you look at the Court's case law under Sherbert and McDaniel and Lucumi and Smith, this is clearly singling out a religious organization with no justification to do so. So just having a free exercise violation takes it out of the clay in the joints where there wasn't one there. I think the other thing is if you're looking at the clay in the joints. Kagan. Kagan. Kagan. Well, that's of course true, that if there's a constitutional right at stake, that trumps. But the question is, how are we going to interpret the constitutional right? What are we so I guess what I'm asking is do you see value in the other side in having some flexibility here for states to make these sorts of choices? I think states have tremendous leeway in the way they set up and decide these types of programs. And here's what I would say, which I think is an easy solution. Number one, the state doesn't have to set up the program in the first place. Number two, it could set it up in a way that say we're only going to do government schools, playgrounds and not any private schools. But once it sets up the program to include all not for profits and all not for profit preschools, it sets out 16 different criteria, neutral criteria, that everyone has to comply with. Then the question is, is when you have a religious organization that meets those criteria, in fact does better on them than almost everybody else, and then you look at the application and say, well, we just found out you're operated by a religious organization, we're going to take you back out of that even though you meet the state's criteria and further our interest better than almost everybody else, that seems to be not a difficult choice. One last time, I know your white light is on, but might the state think that here's the problem. The problem is this church has come in with a very competitive application. We want to give money to this church, let's say a Protestant church. There's a Catholic church across the street. Catholic church applies, doesn't get money. This happens five years running. And people start thinking, well, why is the Protestant church keeping on getting the money and the Catholic church never gets the money? And the state says, we just don't want to sow that kind of division, that kind of mistrust, that kind of, well, that's- Sure. It sounds like a reasonable observer question, but to put that aside for a second, if you know the history and context of the program, you would know that this is a competitive grant and they actually should be religion blind. So if you're not looking at who's applying, you can grade this just like this application was graded highly based on secular and neutral criteria. So anyone knows that the program is purely religion blind, not looking at who's applying, they'll know that it's not favoring any religious organization or secular. But what you do when you favor it, when you remove the religious organizations, even though you've scored them high under your own competition, you're actually singling out for a benefit they should otherwise get under free exercise. If I may say the rest of my time. Thank you, counsel. Mr. Layton. Mr. Chief Justice, and may it please the Court. Justice Alito asked the question as to whether this is an admiral tradition that should be respected, this 39-state tradition of keeping hands off of religion. And the answer from the State's view is yes. In 1820, Missouri's first constitutional convention adopted from Jefferson's Virginia Statute for Religious Freedom the language that no man can be compelled to erect, support, or attend any place of worship. We modified that, made it more specific in the 1865 and 1875 constitutions. And in 1945, it was reenacted in our latest constitution with reference back to the founding era. The question then is whether that fits within this Court's jurisprudence under the First Amendment. And there we look at both the Establishment Clause and the Free Exercise Clause and the play between the joints that this Court confirmed or recognized in Locke v. Davey. Well, you don't want us — you say we don't have to look at the Establishment Clause. In your brief, you said there's no Establishment Clause problem here. No. We say that there is not an Establishment Clause violation. Some of the amici on our side say there is, but know that in the State's view, there is not an Establishment Clause violation. And so Governor Greiten's decision to proceed differently does not violate the Establishment Clause. The question is whether that's the limit. There are Establishment Clause concerns here, even if there is not a violation. And those concerns arise both with regard to endorsement and with regard to entanglement. And is it your argument that this statute is valid to keep us away from close Establishment Clause questions? Yes. Yes. We don't want to be in a position, for example in this case, where we are selecting among churches. We don't want to be in a position where we are making a visible physical improvement on church property. But this is quite different than Locke because this is a status-based statute. Well, in that respect, it is different. In other respects, it's different as well. For example, in that case, we have independent decision-making, which has been key to many of this Court's decisions. In this Court, the decision-making is not by some third party. It is by the State. Well, Mr. Layton, you said you don't want to have a program that makes physical improvements to churches. And I just wanted to ask you about some Federal laws that are highlighted in the amicus brief filed by the Union of Orthodox Jewish Congregations and get your reaction whether a program like that would be permissible under the Missouri Constitution. So one of them is a Federal nonprofit security grant program providing grants through the Department of Homeland Security to harden nonprofit organization facilities that are deemed to be at high risk for terrorist attacks. So if you have a synagogue that is at high risk for an attack by an anti-Semitic group or a mosque that is considered to be at high risk for attack by an anti-Muslim group, would the Missouri Constitution permit the erection of bollards like we have around the Court here? The answer traditionally, and I'm not sure that I can speak for the current Governor of course, I was brought back to argue this case and instructed I could defend the prior position, but the answer traditionally would be no. State money could not be used to actually erect or operate or provide that kind of physical addition to a church or synagogue. Okay. Here's another one. I have two more, if you'll indulge me. This is a Federal program that provided grants for the repair of buildings near the Federal building in Oklahoma City that were damaged by the bombing there. Would that be permitted? Under the traditional view in the State of Missouri, it would not be permitted, provided that those were actually church buildings, worship buildings. Okay. Last one. This is a New York City program that provides security, money for security enhancements at schools where there's fear of shooting or other school violence. Again, under the traditional view in Missouri, if this was actually a cash grant, money leaving the public treasury to go to a church, it would not be permissible. Now, that doesn't mean that a religious-affiliated school could not qualify. The St. Louis University case by the Missouri Supreme Court shows that the Missouri courts have been willing to draw the definition of churches and religious institutions pretty narrowly. So what is the definition of a church? So a religiously-affiliated school is not a church under the Missouri Constitution? The decision with regard to St. Louis University was that even though it is a Jesuit institution that is founded by Jesuits, had a Jesuit president and Jesuits on his board, since it had a self-perpetuating board, even though it declared a Jesuit philosophy, it was determined to be eligible to receive, in that instance, not direct payment from the state, but eligible to receive state money. Why would that be so? I suspect because the Missouri courts are trying to provide as much assistance as they can within the realm that they feel that the Missouri Constitution permits. So suppose we have a school that's run by the Trinity Lutheran Church of Columbia, and then next to it we have a Jesuit elementary and secondary school. One would be eligible, one would not be eligible? It would depend on the nature of the two. In fact, if the Trinity Lutheran went back to the position it was in in 1985, where the preschool was an independent, although somewhat affiliated entity, using the church's facilities, presumably under some kind of a lease arrangement, the state likely would have said yes, because that would be consistent. But even though they're equally controlled by a religious organization? No. I don't think — it would be a fine line in terms of the control, but no. If the organization itself, the church itself, rather than a self-perpetuating board such as with St. Louis University, controlled the preschool, that is what has made the difference in Missouri in the past, although understand we have very few cases in Missouri that have addressed these questions. Mr. Layton, could you go back to where Justice Alito started? Yes. And you said no money to churches. Why can't the state provide police protection or fire protection? Well, the state does, and I think for a couple of reasons. One is that we are not actually taking money from the state treasury and giving it to the church. And this Court has seldom, if ever, actually said it's okay to write a check from the public treasury to a church. So this — we're providing a service. And the service there is not being provided solely for the benefit of the church. The service is being provided for police and fire for the benefit of the public safety. But the whole — that's easy to change. I mean, we imagine a state. State X. And state X says we're not going to provide police protection. We will for everybody, but not a church. And by the way, that costs us extra money. We have to hire extra policemen. We won't. Okay? That's all. Why not? We don't want to. Because they're a church. That's why not. Same with fire protection. Same with vaccination programs. Same with public health. Same with helping children who get sick at school. Okay? You know, the hypotheticals are obvious. Nothing to do with Missouri. But as soon as you answer that, I'll be able to know if it asks you the question in how does this differ. Okay? Well, this differs — No, I'm not asking that yet. Okay. So what are you asking first, then? I'm asking does the Constitution of the United States permit a state or a city to say we give everybody in this city police protection, but not churches? We give everybody fire protection, but let the church burn down. We give everybody public health protection, but not a church. That's the law in my imaginary state. And I'm saying does the Constitution, which guarantees free exercise of religion, permit such laws? I am not going to take the position that it permits those laws. All right. Now, you say no, it does not permit those laws. Very well. If it does not permit a law that pays money out of the treasury for the health of the children in the church, school, or even going to church, how does it permit Missouri to deny money to the same place for helping children not fall in the playground, cut their knees, get tetanus, break a leg, et cetera? What's the difference? The difference is that the establishment concerns that motivate Missouri's policy do not apply in the police and fire context. But they apply here. In health context. So if there's an epidemic — No, I don't know that they apply in health context. Because the kind of examples Your Honor is giving are examples where the benefits are universal. They are not selective, which they are here. They are universal. So if we start on the endorsement side, in those instances, the State is not endorsing a particular church by choosing to provide that church with those benefits and not another church, which is a — Mr. Levin, I understand that — Those are an establishment clause. The entire basis for your rule is that you're afraid of violating the establishment clause, even though you're sure there's no violation of the establishment clause? No. It is that we do not want to come to the edge of violating the establishment clause. I mean, we are not taking the position that we would by doing this. But the question — No, you take the position that it is not, that this is not a violation. It is not a violation. A violation. The question is, do we have to come all the way to the edge of a violation, which is what I think Petitioners are arguing, that as long as we aren't violating, there is no room between. So, Mr. Layton, let's say I accept that the State might have an interest in saying we just don't want to be seen as giving money to one church and not another in these selective programs. And that's the endorsement side. There's also — I think that that's legitimate. But here's the thing. There's a constitutional principle. It's as strong as any constitutional principle that there is, that when we have a program of funding, and here we're funding playground surfaces, that everybody is entitled to that funding, to that particular funding, whether or not they exercise a constitutional right. In other words, here, whether or not they are a religious institution doing religious things, as long as you are using the money for playground surfaces, you're not disentitled from that program because you're a religious institution doing religious things. And I would have thought that that's a pretty strong principle in our constitutional law. And how is it that the State says that that's not violated here? Well, let me react to the way that you set that out. If we're only going to look at the rubber, then what Your Honor asked does make sense. But the rubber doesn't have any meaning until it's placed there and is available for use. And under this theory, we not only have to put rubber on playgrounds, but don't we have to put new paint on the sanctuary if the old one had lead paint? Don't we have to put — reimburse for pews to be upholstered? I mean, what is the — Not under Locke, right? Locke drew a distinction between assistance for devotional theological education and scholarship and others. It did. So perhaps — I mean, maybe you'd have a good argument. Or on the other hand, I mean, if you painted the interior of all sorts of other buildings but singled out religious, I don't know. But it seems to me that that raises much more serious problems than this case. I don't think that Locke — I think that this raises more serious problems than Locke in a number of respects. It is a direct payment to a church. It's not an indirect payment chosen by someone else. It is not available to everyone. It's only available to those who are selected by the State. But here's the deal. You're right that this is a selective program. It's not a general program in which everybody gets money. But still, the question is whether some people can be disentitled from applying to that program and from receiving that money if they're qualified based on other completely non-religious attributes. And they're disqualified solely because they are a religious institution doing religious things, even though they're not — they could promise you, we're not going to do religious things on this playground surface. And you're still saying, well, no, you can't get the money. Well, they could. But that still doesn't get us out of the entanglement issues here. We have a church that, in order to participate, has to agree to curriculum requirements in their preschool. The idea that the government is going to dictate what is taught at its church, even if they are willing to accept it, which they are here, is anathema to the Establishment Clause considerations that have highlighted many of these Court's decisions. You suggested two lines. I'm back to my question. Yes. But it's really quite similar to what Justice Kagan is asking. Once you accepted the first part of what I asked, you agree there has to be a line. Yes. Now, one line you've suggested is the question that you're selecting, rather than giving to everyone. Universal versus collective. But would you say the same case? Were you to give the money to all schools instead of just some by selection, then would be unconstitutional, barring churches? I don't think you would. But wait. Save the other line. The other line, which I want you to contrast, is that where there is a grant given to all schools, private and public, and the purpose, and that grant has nothing to do with religious practice, but it does has to do with health or safety, then you have to do it. What about that? Well, that's. That's. You win on the first. You lose on the second. Those are two competing lines that I'm at least seeing. Maybe there's some others. But if the sole benefit to the church and its members was health and safety, and we could draw that line, that may make some sense. But, of course, that's not true here. It's more than that here. What we are being asked to give to this church is actually a visible improvement in their physical plant, and understand that this is a church that declares in their petition that they use this preschool to bring the gospel message to nonmembers. This is. So if it's not, now your line is the benefit. If the benefit is physical, that's okay. But if it's not, it's not? No. I'm saying that even. Your answer said the issue here is that it's the physical area near the church. No, I'm saying that even physical changes, even if they have a safety element, may still have an entanglement problem. Because we are saying to the church, you have this now incentive to rearrange your property, your church site, in order to maximize the amount you get from the state, rather than maximizing the spiritual development of the children. What if you had a program at the state capitol? You had tours for school groups. And you had someone who coordinated, tied it into the social studies program. School groups can come in, but no religious schools. Is that okay? I don't know that it would be. We don't know. Frankly, we have tours like that. You have to have a position. And it seems to me that if you can't answer the question, whether or not you could prohibit tours for religious schools while allowing tours for other schools, I don't understand the basis of your program, your position. The tours, at least in our experience, are also universal. Everyone who comes to the capitol gets a tour. And so we would be, in terms of universal versus selective, we would be in that same range. But also with regard to entanglement, the tours do not require the state to be entangled in any way with the church and its ministry. And the playground improvement here does require that, not just as to curriculum, but as to the manner in which this is done and the way in which it is portrayed to the community. That's the kind of entanglement that is— What do you mean the way it is portrayed to the community? Well, among other things, in this particular program, the church gets points for telling people in the community that the state paid for this improvement to their church. And so, in essence, it exacerbates the endorsement problem by telling them what they have to say publicly about this particular improvement. Well, I mean, you could say the same thing, that the church is delighted that it has fire protection. Well, I suppose if we said we're only going to provide fire protection to churches that will declare publicly that they appreciate the state's providing that, maybe, but again, that's not selective. And so that statement by the church has no meaning. It can't be perceived as endorsement. But when I drive past this church, and this church has this beautiful new playground surface that the state paid for, I am receiving a message with regard to the state in this particular regard. And so long as the money is granted based on neutral criteria that are faithfully applied, I don't know how you can draw a distinction between a program that's open to everybody and a selective program. And suppose Missouri offered 50 full college scholarships every year to students who achieved certain academic criteria, who satisfied certain academic criteria, and this was open to public school students and private school students. But, you know, after a few years, the school saw, the State saw that a disproportionate number of these were going, among those given to the religiously affiliate, to the private schools, a disproportionate number of the scholarships were going to students at schools that are affiliated with a particular faith. Would it be then justified to say, well, we better not, we better disqualify every student who went to a religiously affiliated school so that they're on any hard feelings? Well, I think that may be an equal protection problem, because I don't know what the basis for that would be. So what's the difference between that situation and this situation? As far as the difference between selective and non-selective? If we're going to deal with the equal protection approach to this, then the question becomes whether our endorsement and entanglement concerns are a rational basis. No, I'm not talking about equal protection. You said that it matters that this is selective as opposed to not selective. And what is the basis for drawing that distinction? I thought that your asserted basis was it prevents the perception of favoritism. Yes. It does, because this is a very selective program. Very few institutions get it. And unlike the scholarship example, or frankly the example in Lock v. Davey, it is a publicly visible, manifest demonstration of State endorsement. But I don't understand, I can understand how the State's interests might differ some, but essentially this is a program open to everyone. Happens to be a competitive program, but everyone is open to compete on various neutral terms. And you're depriving one set of actors from being able to compete in the same way everybody else can compete because of their religious identification. And that is what we were doing because we are concerned about the endorsement and entanglement issues that arise in connection with this type of a program. Yes. And those are interests. I don't mean to say that those are not valid interests. But it does seem as though this is a clear burden. Looked at that way, this is a clear burden on a constitutional right. And then your interests have to rise to an extremely high level. Well, I don't know that I ---- Burden on the constitutional right, in other words, because people of a certain religious status are being prevented from competing in the same way everybody else is for a neutral benefit. Well, this is, it's not like McDaniel where someone is being barred from participating in the life of the community. This is a, kind of the opposite of that. It is not like what we have in Locke in the sense that here we have, we really have a direct payment to a church. I'm not sure, I'm not sure I'm answering your question, Your Honor. Mr. Courtman, I'm sorry, Mr. Leighton. I know the court is very grateful that you took up the request of the Missouri Attorney General to defend the old position. But I am worried about the, if not the mootness, the adversity in this case. If the Attorney General is in favor of the position that your adversary is taking, isn't his appointment of you creating adversity that doesn't exist? Well, I don't know the answer to that, but let me give some of the factual background here. The Attorney General himself is recused because he actually appears on one of the briefs on the other side. The first assistant in this instance is the acting Attorney General, and the acting Attorney General at a time before the Governor gave his new instruction asked me to defend the position because at that point it was still the position of the state and was not being disavowed. Well, but that's the question. It doesn't appear to be the position of the state right now. Reading through the lines of the acting Attorney General to us, it doesn't appear that he believes that you're taking the right position. So let me talk about what has happened and what happens next. After the Governor made his announcement, the Director, who is my client here, in fact put up on her website the 2017 application and 2017 instructions in which she largely tracked the 2016 and prior ones, including 2012 that the court has, but eliminated all reference to church's religious instruction. All of those were eliminated. That's all I know about what she intends to do because I don't represent her with regard to that. I'm asking a simple question. If she is the state and she is a representative of the state are not willing to fight this case, are they manufacturing adversity by appointing you? So well, we have no adversity. Hasn't this case become mooted? So let me let me tell you what happens next if the Director actually grants issues a grant to a church. If she does, then under Missouri's liberal taxpayer standing rules, someone can then sue and say you are violating the state constitution. And if there is a termination that that she was violating the state constitution, then the question before the court today would have to be answered. Roberts. You do agree that this court's voluntary cessation policies apply to the mootness question? I agree that they can apply to this. It's not a perfect fit compared to some of the precedents. But but certainly there is no assurance that four years from now with a change of administration or at some point in the interim through a taxpayer standing suit that there wouldn't be a change back to the prior practice. Mr. Layton, I'm struggling still to understand Justice Kagan's question. The answer to it. How is it that discrimination on the basis of religious exercise is better in selective government programs than general programs first? And second, how do we tell the difference between the two? If that's the line we're going to draw the tours, isn't it selective based on who can show up at the Capitol and afford to do that? Public benefit programs. Aren't they often selective if you meet criteria, copyright laws? You have to have an original work, things like that. What do we do about those problems? Well, I still maintain my position that when we have a a case where it is a selective program that is publicly announced, publicly visible, that that is different from these other kind of programs. How do we draw the line between selective and general? One could seem to play with that line forever. Well, one could, just like the rest of the lines in this case. We don't get a fine line. Well, discrimination on the basis of the status of religion, there's no line drawing problem there. We know that's happened in this case, right? We do know that the decision here was made because it was a church. And assuming that's what status means, then I suppose we know that. I mean, that's true. If you make that the line, selective versus universal, if you'd like, well, you can volunteer fire departments most places, but the state give grants to upgrade the upgrade. We don't have enough money, so we have selection. Same with police. You have crossing guards. You know you have dangerous intersections. There are crossing guards. We have grants to help the schools pay for the children. Do the same thing with health of children. You know, I can do that. That's what I see as a difficulty. We choose your line there, and we proliferate litigation forever. Well, let me make that clear. In areas that are critical, like police, fire, health. Police, fire, and health, when they're universal, but you gave the crossing guard example. Yeah, I did. And in Missouri, that's not universal. Of course, that's my problem. I can reproduce programs in the state that seem absolutely necessary for police protection, fire protection, health of children. And it seems like an irrelevant factor, whether they're just open to everybody to apply and you automatically get it, or whether you have criteria and are selective because you have a limited amount of money. And you want to make that line the constitutional line on free exercise? I'm afraid of that one. Now, I put that out so you can reply. Well, and the answer would be that the line is some combination. And I can't give you a bright line because you're rejecting the bright line that we have. Some kind of combination of the endorsement problems with selectivity and the entanglement problems that come when we are dealing with grant programs that actually affect the physical plant of a church and how that plant is used in a preschool or otherwise. There is no way for the state to comply with its determination, maybe the requirement, that we police the use of the funds and what the funds here put on there without becoming involved with the church. There's a statement in the appellant's brief that says that the church is told that it can't participate in the life of the community. But what Trinity wants is to have the community participate in the life of the church. And that is anathema to the kind of basic doctrines that we get out of the founding era that provided for a division between- Why would it be on the basis of the physical plant as opposed to, say, personnel or non-physical grant money? Why wouldn't what be? Well, now the line is moving. Now it's apparently on the basis of whether we're granting the money to the physical plant or to some other purpose. Well, no, I'm saying that the physical plant is our case because the physical plant is an improvement to the church property that the church will use and may use for actually proselytizing and not just use it for religious activities. I mean, wherever the line is, that ought to be on the other side of the line, just like wherever the line is, writing a check that says payable to Trinity Lutheran Church ought to be on the other side of the line. Thank you. Thank you, Mr. Leighton. Mr. Cortman, you have three minutes remaining. Thank you, Mr. Chief Justice. Just three points in rebuttal. First of all, as to the endorsement problem, I think the neutral government criteria here take care of the endorsement problem. So when you have this competitive grant that you have to fill out this pretty complicated application, 16 neutral criteria, there is no endorsement of religion. I think the free speech cases give a good analog to that. Number two, as far as the selective or universal government benefit program, I don't think that is really the test here. And the reason, as Your Honors mentioned, if this was open to all schools and it was universal, they still would be prohibited from giving a grant to the religious organization. So whether it's a narrow class of all non-for-profits or a broader class of all schools, they would still not be able to fund based on their constitution. And lastly, as we talk about entanglement, this is not an entanglement issue. Entanglement generally is an ongoing intrusive surveillance. It's not a one-time grant where you have to show a receipt for the expense to receive the embursement. If there are no other questions, I yield my time. Roberts. Thank you, counsel. The case is submitted.